# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs July 12, 2016

## STATE OF TENNESSEE v. ALLEN BOOKER

**Appeal from the Criminal Court for Shelby County**
**No. 14-04084     J. Robert Carter, Jr., Judge**

_____

**No. W2015-02020-CCA-R3-CD – Filed September 15, 2016**

_____

The defendant, Allen Booker, was convicted by a Shelby County Criminal Court jury of aggravated robbery, a Class B felony, and was sentenced to ten years in the Department of Correction.  On appeal, he argues that the trial court erred in denying his motion to suppress his statement and that the evidence is insufficient to sustain his conviction.  After review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT W. WEDEMEYER, JJ., joined.

Stephen C. Bush, District Public Defender; Tony N. Brayton (on appeal) and Charles B. Walker (at trial), Assistant Public Defenders, for the appellant, Allen Booker.

Herbert H. Slatery III, Attorney General and Reporter; Zachary T. Hinkle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Bridgett Stigger, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTS

This case arises out of the February 14, 2014 robbery of Keenan Hall, the victim, at gunpoint, while he sat in his car outside his home after returning from visiting his girlfriend.  The defendant was developed as a suspect when his fingerprint was discovered on the handle of the victim's car door and the victim had indicated that the perpetrator had touched the door handle.  The defendant was arrested and gave an incriminating statement to the police.  He was indicted for one count of aggravated robbery.

## Suppression Hearing

On October 29, 2014, the defendant filed a general motion to suppress evidence against him, including any confessions. Thereafter, on February 6, 2015, he filed another motion to suppress, which more specifically targeted the statement he provided to police following his arrest.

At a suppression hearing conducted prior to trial, Detective Nicholas Dandridge with the Memphis Police Department testified that he was assigned to investigate the aggravated robbery of the victim. The victim reported that he was robbed while sitting in his car in his driveway when he returned from visiting his girlfriend and stopping to pick up some food. A man approached his car and pointed a handgun at him, demanding money. The police located a fingerprint, which matched the defendant, on the door handle of the victim's vehicle. After identifying the defendant as a suspect, Detective Dandridge arrested him and interviewed him at the police station, accompanied by Sergeant Pruitt.

At the outset of his interview of the defendant, Detective Dandridge read the defendant the Miranda rights from a standard Advice of Rights form. Detective Dandridge elaborated that Miranda rights are "the rights we read to people who [are] under arrest so they can know that they do have rights before we speak with them prior to an interview or giv[ing] a statement." The defendant signed and initialed the form, indicating that he understand each right. The defendant did not appear to be under the influence of any intoxicants. He told Detective Dandridge that he had graduated from high school but did not tell the detective that he could not read. After the defendant waived his rights and agreed to speak with the detective concerning the incident, Detective Dandridge took a statement from him that was reduced to writing for the defendant's approval.

The statement itself consisted of questions asked by Detective Dandridge and the defendant's answers to those questions. The defendant admitted his involvement in the robbery, and the facts he gave corroborated much of the victim's statement. The defendant stated that he went to the victim's house and approached the victim, who was sitting in his car, with a BB gun. He claimed that he was trying to get money the victim owed him from a dice game earlier in the day. He said that the victim did not have any money and offered the defendant his food instead. The victim then gave his phone to the defendant.

After Detective Dandridge typed the defendant's statement, he asked the defendant to read and initial it to verify it was true and accurate. The defendant told

2

Detective Dandridge that he could not read, and he agreed to have an officer who was not involved in the case, Detective Marlon Carter, read the statement aloud to him. After Detective Carter read the statement to the defendant, the defendant said that he understood the statement and signed and initialed it, agreeing to the veracity of its contents. The defendant had no trouble signing or spelling his name.

Marlon Carter, formerly a detective with the Memphis Police Department but currently a criminal investigator with the Shelby County Attorney General's Office, testified that on February 28, 2014, he was asked by Detective Dandridge to read a statement to the defendant, who had advised that he could not read. Mr. Carter read the statement to the defendant line-by-line, and he noted that the defendant appeared to understand everything. After he finished reading the statement, Mr. Carter asked the defendant if he understood what had been read to him, and the defendant said that he did. Thereafter, the defendant signed the statement without making any corrections. The defendant signed in cursive and print and had no trouble doing so.

The defendant presented the testimony of Vernetta Anderson, an employee of Literacy Mid-South, an organization that provides instruction for people wanting help with reading and math skills, particularly adults who are functionally illiterate. As part of her job, Ms. Anderson conducted literacy assessments of those entering the program, and she estimated that she had administered more than 3000 examinations. Based on her experience, Ms. Anderson was qualified as a literacy assessment provider.

Ms. Anderson testified that she administered a literacy test to the defendant. The defendant tested at a reading level of a person in the third or fourth month of kindergarten. Ms. Anderson was shown a copy of the statement that the defendant signed and opined that he would not have been able to read or comprehend the statement.

On cross-examination, Ms. Anderson acknowledged that the defendant was capable of understanding what someone read to him. She also acknowledged that there was no way for her to determine whether an individual she was assessing was being truthful that they could not recognize a word.

Fannie Booker, the defendant's aunt, testified that the defendant had lived with her the past few years. She said that the defendant had graduated from high school but was unable to read. She specifically noted that, if the defendant received any mail, she had to read it to him. However, she agreed that the defendant could understand things that were told to him.

After hearing argument from the parties and considering the evidence, the trial court found that, although the defendant's statement was given while he was under

custodial interrogation, the defendant was advised of his rights and indicated that he understood that he did not have to give a statement to the police but chose to do so. The court noted that the defendant's statement was somewhat self-serving in that he attempted to minimize his culpability by claiming that he did not point the gun and saying that it was a BB gun. The court noted the testimony regarding the defendant's difficulty with reading but believed that the defendant signed his statement as an indication that he understood it. The court accredited Mr. Carter's testimony that he did not participate in the investigation and that he read the statement aloud to the defendant, who agreed that it was the statement he had given to Detective Dandridge. The court concluded that the defendant was able to understand that he did not have to talk to the police and voluntarily chose to give a statement. Accordingly, the court held that the defendant's statement was admissible and denied the defendant's motion.

## Trial

### State's Proof

The victim testified that he was a seventeen-year-old high school student at the time of the offense. On February 14, 2014, he returned home around 11:00 p.m. after spending the evening with his girlfriend. He had picked up some food on his way home and was sitting in his car eating and reading text messages when a man armed with a firearm approached his driver's side door and told him to unlock the door. The robber pulled the food off the victim's lap and searched his pockets. The robber then grabbed the victim's cell phone and wallet and walked away.

The victim recalled that the robber was over six feet tall and light-complected, and he identified the defendant as the robber at trial. However, the victim admitted that he had been unable to identify the defendant from a photographic array days after the incident or at the preliminary hearing. The victim explained that he could now recognize the defendant because it "clicked" in his mind that the defendant was the man who robbed him after he was told that the defendant was a suspect. The victim denied seeing the defendant prior to the robbery or playing dice. The victim identified a surveillance video from his home that captured the robbery, and the video was played for the jury.

On cross-examination, the victim said that his parents would be disappointed if he gambled. The victim admitted that, based on his observations alone, he could not say with certainty that the defendant was the man who robbed him.

Soloman Hall, the victim's father, testified that, on the night of the incident, he and his wife had gone out to dinner when the victim called and said he had been robbed.

4

Later, Mr. Hall downloaded a copy of the surveillance video for the police. Mr. Hall said it would be surprising for the victim to gamble, given his character and busy schedule.

Officer Walter Everhart with the Memphis Police Department lifted fingerprints from the driver's side door handle of a 2013 Honda Accord. The police had watched the surveillance video from the home and determined where on the vehicle to look for latent prints. Nathan Gathright with the Memphis Police Department, an expert in latent fingerprint identification, identified a latent print lifted from the driver's side door handle of the Honda Accord as being a match to the defendant's print in the fingerprint database. Rachel Bowen of the Records and Identification Division within the Shelby County Sheriff's Office took the defendant's fingerprints during the trial and testified they were a match to the prints the office had on file for the defendant.

Detective Dandridge with the Memphis Police Department testified that the defendant was arrested and interviewed as a suspect after his fingerprint was found on the victim's vehicle. The defendant was advised of his <u>Miranda</u> rights both orally and in writing, and the defendant waived his rights and agreed to give a statement. The defendant gave a statement to Detective Dandridge and Sergeant Pruitt. Afterwards, Detective Dandridge asked the defendant to read over the statement, and the defendant began to but then said that he could not read. Detective Dandridge arranged for Mr. Carter, who was a detective at that time but not involved in the investigation, to read the statement to the defendant. The defendant then signed the statement as being true and accurate.

Detective Dandridge read the statement to the jury. In his statement, the defendant admitted that he was involved in the robbery and said he was accompanied by his cousin, Deandre Jackson. The defendant said that he was armed with a BB gun to scare the victim. He said that he asked the victim for money, but the victim said that he did not have any and tried to give the defendant his food. The defendant took the victim's cell phone instead. The defendant claimed that he had met the victim earlier in the day while playing dice and that he had loaned the victim some money, which he had come to collect the evening of the robbery. The defendant left the scene in a burgundy Lexus driven by Deandre Jackson. In his statement, the defendant said that he lived at 3862 Jasmine Drive and told the officers that he had a .357 revolver, a BB gun and some bullets at that address. He described for the officers where the weapons were located in his house. The defendant said that he pawned the cell phone for cocaine. Detective Dandridge testified that a search of the defendant's residence uncovered no weapons as described by the defendant.

Marlon Carter, a former detective with the Memphis Police Department, testified that he was asked to read the defendant's statement to him because the defendant said

that he could not read. Mr. Carter stated that he was fully satisfied that the defendant understood what was being read to him.

## Defendant's Proof

Allen Booker, Jr., the defendant's father, testified that the defendant has had "mental problems" his entire life. The defendant cannot read, write, or comprehend things. Mr. Booker said that the defendant "would crack" if he was put "under pressure" and "may agree with anything you put forward." Mr. Booker denied having a nephew named Deandre Jackson or knowing anyone by that name.

Fannie Booker, the defendant's aunt, testified that the defendant had lived with her since 2000. She said that the defendant was arrested on February 28, 2014, and the police searched her residence later that day. The police recovered no guns or ammunition during the search.

The defendant testified that when he was arrested, Detective Dandridge first asked him if he had been involved in car burglaries before turning his interview to the robbery of the victim. He said that he told Detective Dandridge that he knew the victim from a dice game earlier the day of the robbery and that the victim owed him money. Detective Dandridge asked him if he wanted to provide a statement, and he said "no" because he cannot read or write. The defendant stated that he denied to the detectives that he committed the robbery. The defendant identified his initials and signature on the advice of rights form and his statement but said that he could not read either document. The defendant acknowledged that Mr. Carter read portions of his statement to him but claimed that some of what was in the statement read in court was not what Mr. Carter read to him. According to the defendant, he told the police about the dice game with the victim, but he did not say anything about guns or bullets being at his house. The defendant denied knowing anyone named Deandre Jackson, taking a cell phone from the victim, or pawning a cell phone to someone named "Frog."

On cross-examination, the defendant admitted that he understood the statement read to him by Mr. Carter but claimed that Mr. Carter did not read those portions of the statement suggesting he was involved in the robbery. On redirect examination, the defendant said that he can read small words and also understand things very well.

The jury convicted the defendant, as charged, of aggravated robbery. Following a sentencing hearing, the trial court imposed a sentence of ten years in the Department of Correction.

ANALYSIS

## I. Motion to Suppress

The defendant argues that the trial court erred in denying his motion to suppress his statement, arguing that it was given without a knowing and intelligent waiver of his rights.

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The corresponding provision of the Tennessee Constitution states "[t]hat in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. Thus, to be admissible at trial, a confession made while under custodial interrogation must be shown to have been freely and voluntarily given, after the defendant's knowing waiver of his constitutional right to remain silent and to have an attorney present during questioning. See Miranda v. Arizona, 384 U.S. 436, 444 (1966). Courts look to the totality of the circumstances to determine whether a confession is voluntary. State v. Smith, 933 S.W.2d 450, 455 (Tenn. 1996).

When this court reviews a trial court's ruling on a motion to suppress evidence, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Moreover, the party prevailing at the suppression hearing is afforded the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998). The findings of a trial court in a suppression hearing are upheld unless the evidence preponderates against those findings. See id. The application of the law to the facts found by the trial court is a question of law and is reviewed de novo. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001).

The defendant claims that the trial court found that he did not understand his Miranda rights or make a voluntary waiver of them until after Mr. Carter read his statement aloud line-by-line, which included a standard form advice of rights. As such, he asserts that he did not knowingly and voluntarily waive his rights *prior* to making a statement.

The defendant's argument, however, is inconsistent with the trial court's findings. The court explicitly found:

7

I have to . . . decide and what I am deciding is that [the defendant] understood that he did not have to give a statement to the police. The officer testified that they explained that to him. I think his quote was I want to make sure that he understood his rights. Where we were, we were police officers. And I'm finding that [the defendant] was advised of those rights and indicated that he understood he did not have to give a statement to the police. . . . [A]nd then he proceeded to do so. He was willing to.

As noted, the trial court found that the defendant was advised of his rights and indicated that he understood them *before* he provided the statement.

At the suppression hearing, Detective Dandridge testified that he read the defendant his rights at the outset of the interview and had him initial alongside each right and sign at the bottom to indicate that he understood before giving a statement. The trial court determined that the defendant was "able to understand he didn't have to tell the police what went on and that he chose voluntarily to do so." The trial court's finding is supported by the testimony of the officers who stated that the defendant engaged with them and appeared to understand what was happening, as well as by the defendant's testimony at trial that he can understand things even if he cannot read. The evidence does not preponderate against the trial court's finding that the defendant made a knowing and voluntary waiver of his rights before giving his statement to the police.

## II. Sufficiency of the Evidence

The defendant also challenges the sufficiency of the evidence, asserting that the evidence fell short of the beyond a reasonable doubt standard. In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and

resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Aggravated robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear" when it is "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon[.]" Tenn. Code Ann. §§ 39-13-401(a), -402(a)(1).

The victim testified that a man armed with a firearm approached the driver's side door of his car and told him to unlock the door. The robber pulled the food off the victim's lap and searched his pockets. The robber then grabbed the victim's cell phone and wallet and walked away. At trial, the victim identified the defendant as the man who robbed him. A surveillance camera captured the robbery. The video depicted a man approaching the victim's car, as the victim described, before searching him and fleeing. The defendant's fingerprint was found on the car's door handle, where the surveillance video and the victim's testimony indicated that the robber had touched. The defendant admitted to the police that he had taken the victim's phone, although he claimed he did it in order to satisfy a gambling debt the victim owed him. This evidence is sufficient to demonstrate that that defendant intentionally took property from the victim, while armed with a deadly weapon or an article fashioned to make the victim believe it was a deadly weapon.

The defendant argues that the victim's identification of him is questionable because the victim could not identify him from a photographic array after the robbery or at a preliminary hearing. The victim conceded that he was not able to identify the defendant solely upon his own observations but explained at trial that, after he was told

9

the defendant was a suspect, it "clicked" in his mind that the defendant was the man who robbed him. The jury was aware of the initial difficulties the victim had identifying the defendant and that his present ability to identify him was based in part upon knowing that the defendant was a suspect, and it resolved questions about the weight and credibility of the victim's identification of the defendant as it saw fit.

In addition to the victim's identification of the defendant, the defendant's fingerprint was found on the car where the surveillance video and testimony indicated that the robber had touched it. The defendant's assertion that it "is not known when the door was touched by [him]" calls for idle speculation, especially when there is no indication that the defendant was ever near the victim's car prior to the robbery.

Moreover, the defendant provided a statement to the police admitting his involvement in the robbery. Although the defendant claims he did not implicate himself as reflected in the statement, Detective Dandridge and Mr. Carter both testified that Mr. Carter read each line of the statement to the defendant who agreed with the statement as written. While the defendant also argues that the statement contains uncorroborated information that he was with a man named Deandre Jackson in a burgundy Lexus, the State was not required to prove the veracity of each facet of the defendant's statement. The jury needed only to believe the testimony of Detective Dandridge and Mr. Carter that the statement accurately reflected what the defendant told them. The defendant's further assertion that he did not understand the contents of his statement is countered by his own testimony in which he admitted that he understood the statement Mr. Carter read to him. The only dispute for the jury was whether Mr. Carter read the entire statement to the defendant, a question it resolved against the defendant.

We conclude that, in the light most favorable to the State, the evidence is sufficient for a rational trier of fact to find the defendant guilty of aggravated robbery.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE

10